**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Jay Curtin, | No. CV-21-00790-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff challenges the denial of his application for disability insurance benefits under Title II of the Social Security Act ("the Act") by Defendant, the Commissioner of the Social Security Administration ("Commissioner" or "Defendant"). Having reviewed the briefs (Docs. 15, 19, 20) and Administrative Record (Doc. 14, AR.), the Court now reverses the Administrative Law Judge's ("ALJ") decision and remands for additional proceedings consistent with this order.

## I.     THE SEQUENTIAL EVALUATION PROCESS AND JUDICIAL REVIEW

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. *E.g.*, 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is engaging in substantial, gainful work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the Plaintiff is engaged in such work, he is not disabled. *Id*. If he is

not engaged in substantial gainful work activity, the analysis proceeds. *See id*. At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the Plaintiff does not, he is not disabled. *Id*. If he does, the analysis proceeds to step three. *See id*. At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or is medically equivalent to an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. *Id*. If not, the ALJ will assess the claimant's residual functional capacity ("RFC") and proceed to step four, where the ALJ determines whether the claimant is still capable of performing his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can perform his past relevant work, he is not disabled. *Id*. If he cannot, the analysis proceeds to the fifth and final step, where the ALJ determines if the claimant can perform any other work in the national economy based on his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot, he is disabled. *Id.*

This Court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (cleaned up). In determining whether substantial evidence supports a decision, the court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (quotations and citations omitted). As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

## II.    PROCEDURAL HISTORY

Plaintiff filed an application for Title II disability benefits on November 21, 2018

1   alleging disability beginning January 1, 2015.[1] (AR. at 232-33.) Plaintiff's date last insured
2   ("DLI") for the purposes of this application—the date by which his disability must be
3   established under Title II[2]—is December 31, 2019. (AR. at 16.) The agency denied
4   Plaintiff's claim at the initial and reconsideration phases of administrative review (AR. at
5   150-53, 157-62), and Plaintiff timely requested a hearing before an ALJ (AR. at 163-64).
6   ALJ Robert Kelly presided over a telephonic hearing on August 17, 2020 at which Plaintiff
7   and vocational expert ("VE") Robin Cook testified. (AR. at 55-81.) At the hearing, Plaintiff
8   amended his alleged onset date to October 25, 2017. (AR. at 56.) ALJ Kelly issued an
9   unfavorable decision on September 28, 2020. (AR. at 13-29.) Plaintiff appealed (AR. at
10  230-31, 347-54), and the Social Security Appeals Council denied review in a letter dated
11  March 4, 2021 (AR. at 1-3). Plaintiff filed the complaint initiating this civil action on May
12  4, 2021. (Doc. 1.)

13      In the unfavorable decision, the ALJ found Plaintiff had not engaged in
14  disqualifying substantial, gainful work activity, and that he suffered from severe
15  impairments including ischemic heart disease, status-post pacemaker implantation,
16  coronary artery disease, and obesity. (AR. at 16-17.) The ALJ found Plaintiff's
17  impairments did not meet and were not medically equivalent to any listed impairment at
18  step three, and that Plaintiff retained the ability to perform sedentary work, with a five-
19  minute "sit-stand option" every hour, and various postural and environmental limitations,
20  such as the need to avoid more than occasional exposure to pulmonary irritants. (AR. at

---

[1] Plaintiff filed prior applications for benefits in January 2015 which an ALJ denied after a hearing in July 2017. (AR. at 32-54, 85-95.) By virtue of administrative res judicata, a presumption of continuing non-disability takes hold and applies to the period after the previous unfavorable ALJ decision. *See Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995) (amended April 9, 1996) *superseded by regulations on other grounds as recognized in Farlow v. Kijakazi*, 53 F. 4th 485, 488 (9th Cir. 2022). Plaintiff may rebut this presumption on his new application by providing evidence of "changed circumstances." *Id.* (citations omitted). Changed circumstances can include evidence of a new impairment not previously considered. *Id.* at 827. In the September 2020 decision at issue here, the ALJ concluded "there is a change in circumstance, as there have been changes to [Plaintiff's] condition since the 2017 decision." (AR. at 16, citations omitted.) As such, the ALJ engaged in "new analysis of [Plaintiff's] [RFC], impairments, and ability to perform past relevant work." (AR. at 16.)

[2] *Wellington v. Berryhill*, 878 F.3d 867, 872 (9th Cir. 2017).

1  19.) The ALJ found Plaintiff capable of performing his own past relevant work at step four.

2  (AR. at 23.)

3  **III.    DISCUSSION**

4          Plaintiff raises three issues on appeal: (1) whether the ALJ erred by finding

5  Plaintiff's mental impairments not severe; (2) whether the ALJ erred by rejecting the

6  opinions of Plaintiff's treating providers and a consultative examiner; and (3) whether the

7  ALJ erred by rejecting Plaintiff's symptom testimony. (Pl. Br. at 1.) The ALJ did err by

8  discrediting the opinions of two of Plaintiff's treating physicians. The matter is, thus,

9  remanded for further proceedings.

10 **A.    The ALJ's step two findings**

11         At step two of the sequential evaluation process, the ALJ found Plaintiff suffered

12 from severe, medically-determinable physical impairments, but that Plaintiff's depression

13 and anxiety "did not cause more than minimal limitation in the claimant's ability to perform

14 basic mental work activities and were therefore non-severe." (AR. at 17.) The ALJ

15 evaluated the evidence under the "four broad functional areas" known as the "Paragraph B

16 criteria" used to evaluate the severity of mental impairments at step two. (AR. at 17.) The

17 ALJ found Plaintiff suffered only a mild limitation in the areas of understanding,

18 remembering, and applying information; interacting with others; and adapting or managing

19 oneself; and that Plaintiff had no limitation in concentrating, persisting, or maintaining

20 pace. (AR. at 17.)

21         A finding of medical severity at step two "is merely a threshold determination meant

22 to screen out weak claims. It is not meant to identify the impairments that should be taken

23 into account when determining the RFC." *Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th

24 Cir. 2017) (cleaned up). In assessing RFC, the ALJ must account for all of the claimant's

25 restrictions and limitations, even those imposed by non-severe impairments. *Id*. at 1049

26 (citations omitted). If the ALJ finds a claimant suffers severe impairments at step two, that

27 claimant is not prejudiced by any step two error. *Id*.; *Heller v. Comm'r of Soc. Sec. Admin.*,

28 No. CV-17-00243-TUC-DTF, 2018 WL 4377162, at *4-6 (D. Ariz. Sept. 14, 2018) (citing

*Buck*), *aff'd sub nom. Heller v. Saul*, 794 F. App'x 644 (9th Cir. 2020); *Deckard v. Saul*, No. 18-CV-04301-BLF, 2020 WL 1157026, at *4 (N.D. Cal. Mar. 10, 2020) (citing *Buck*).

Here, the ALJ properly supported his analysis of the Paragraph B criteria with substantial evidence from the record. The ALJ cited mental status examinations revealing "many normal findings" (AR. at 18, citing 358, 509, 753, 756, 781, 837; 1066, 1100 1163); Plaintiff's increased activity levels (AR. at 18, citing 1211, 1217, 1223); and the effectiveness of his medication (AR. at 18 citing 794, 1046). Plaintiff draws attention to the ALJ's statement that Plaintiff "could live in a house with his family[,]" as evidence of his functionality. (Pl. Br. at 16, citations omitted.) ("Outrageously, the ALJ claims the claimant's mental impairments are not severe because 'he could live in a house with his family', apparently ignoring that given his poverty he has no other choice except homelessness.") But the ALJ's analysis of the issue extends beyond that deficient assertion.

In any event, the ALJ concluded that Plaintiff suffered other severe impairments and proceeded with the sequential evaluation, thus, Plaintiff "could not possibly have been prejudiced[]" on the basis of any step two error. *Buck* 869 F.3d at 1049. The question is whether the ALJ properly accounted for Plaintiff's mental health impairments in formulating the RFC. *Id.* (citing *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996)). In his discussion of RFC, the ALJ considered the mental limitations assigned by all medical sources, including the psychological examiner, Dr. Hauke, and the treating mental health nurse practitioner, Ms. Gaines. (AR. at 22.) The ALJ found each opinion unpersuasive for several reasons, including Plaintiff's generally normal mental findings, "high level" of individual functioning, and response to medications. (AR. at 22.) For the reasons explained in further detail below, the ALJ cited sufficient reasons for finding the opinions of Dr. Hauke and nurse practitioner Gaines unpersuasive. While there is substantial evidence in the record to support the ALJ's step two findings and his decision to omit limitations related to Plaintiff's depression and anxiety from the RFC, the ALJ nevertheless erred with respect to his assessment of Dr. Lababidi's and Dr. Bierman's

1  opinions.

2  **B.    The medical opinions**

3       Under regulations governing the evaluation of medical opinion evidence for

4  disability claims filed on or after March 27, 2017, the ALJ will not defer to a medical

5  opinion based upon the existence of a treating or examining relationship. 20 C.F.R.

6  § 404.1520c(a). Instead, he must only articulate how he considered two factors:

7  supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The regulations explain that,

8  regarding supportability, "[t]he more relevant the objective medical evidence and

9  supporting explanations presented by a medical source are to support his or her medical

10  opinion(s) . . . the more persuasive the medical opinions . . .will be." 20 C.F.R.

11  § 404.1520c(c)(1). Regarding consistency, "[t]he more consistent a medical opinion(s) . . .

12  is with the evidence from other medical sources . . ., the more persuasive the medical

13  opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). While the ALJ must also consider

14  other factors, such as the existence of a treating or examining relationship and the

15  frequency with which the provider examined the claimant, the ALJ is not required to

16  explain how he considered them unless he "find[s] that two or more medical opinions . . .

17  about the same issue are both equally well-supported . . . and consistent with the record . . .

18  but are not exactly the same[.]" 20 C.F.R. § 404.1520c(b)(3). In *Woods v. Kijakazi*, the

19  Ninth Circuit recently held that for cases to which the new regulations apply, ALJs are no

20  longer required to cite "clear and convincing" or "specific and legitimate" reasons to reject

21  a treating or examining physician's opinion. 32 F.4th 785, 787, 792 (9th Cir. 2022). Instead,

22  ALJs must now articulate how persuasive each medical opinion is using the supportability

23  and consistency factors, and their explanations must be supported by substantial evidence.

24  *Id.*

25       Plaintiff challenges the ALJ decision that the opinions of four different providers

26  were unpersuasive—Plaintiff's cardiologist, Dr. Lababidi; Plaintiff's treating primary care

27  physician, Dr. Bierman; his treating mental health nurse practitioner, Ms. Courtney Gaines;

28  and the psychological consultative examiner, Dr. Hauke. (Pl. Br. at 18-22.) The Court will

- 6 -

1  address each opinion in turn.

2  **1.      Plaintiff's treating cardiologist, Dr. Zaki Lababidi**

3          Plaintiff's treating cardiologist, Dr. Lababidi, completed an assessment of Plaintiff's

4  functioning on August 5, 2020 wherein he assigned to Plaintiff significant physical and

5  mental limitations and identified and described Plaintiff's symptoms. (AR. at 1240-43.)

6  Dr. Lababidi concluded, for instance, that Plaintiff could only stand or walk for less than

7  two hours, and sit for "about 2 hours," in an eight-hour workday. (AR. at 1241.) He opined

8  Plaintiff "cannot walk distances," that he would need unscheduled breaks and to elevate

9  his legs to chair level, and that he should "avoid sitting for prolonged periods of time[.]"

10  (AR. at 1241-42.) He identified specific objective evidence that proved the existence of

11  Plaintiff's impairments, and noted Plaintiff experienced symptoms such as chest pain,

12  exertional dyspnea, anginal equivalent pain, exercise intolerance, dyspnea at rest,

13  peripheral edema, chronic fatigue, and nausea. (AR. at 1240.) He opined that stress can

14  exacerbate Plaintiff's symptoms resulting in the inability to perform even "low stress"

15  work, and that Plaintiff should "avoid all exposure" to environmental irritants, such as

16  cigarette smoke, perfumes, odors, gases, dust, chemicals, and cleaning products. (AR. at

17  1241-42.) Dr. Lababidi concluded Plaintiff's various symptoms would interfere with his

18  attention and concentration for 25% or more of the workday, and that he would miss at

19  least four days of work per month due to his symptoms. (AR. at 1241-43.) Dr. Lababidi

20  stated he had treated Plaintiff since 2010 (AR. at 1240), and that the limitations he assessed

21  existed as early as 2013 (AR. at 1243).

22          The ALJ found this report unpersuasive, as it was "not supported by and[ ]not

23  consistent with the evidence." (AR. at 23.) The ALJ explained that the opinion was given

24  eight months after Plaintiff's DLI, "and there is no statement that such limitations related

25  back to the period at issue." (AR. at 23.) The ALJ found Dr. Lababidi's environmental

26  limitations were "extreme," and "impossible to meet for all but the most sanitized

27  conditions and workplaces" including "most living spaces." (AR. at 23.) The ALJ finally

28  noted "there is no explanation with evidence for many of the specific limitations found."

(AR. at 23.)

The ALJ's reasoning that Dr. Lababidi did not relate his limitations back to the period at issue is erroneous: Dr. Lababidi concluded, "to a reasonable degree of medical certainty," that the limitations he assigned existed as early as 2013. (AR. at 1243.) Defendant argues that Plaintiff testified he was working at that time (Def. Br. at 14), but, while the ALJ might have used that fact to limit his acceptance of Dr. Lababidi's opinion, he did not, and thus the Defendant is precluded from arguing the point. *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.") (citations omitted). The ALJ repudiated Dr. Lababidi's opinion on the basis that the doctor failed to specify that the limitations existed during the relevant period, not that Plaintiff was working when those restrictions allegedly took effect. (AR. at 23.) Plaintiff does bear the burden of proving disability prior to his DLI, *e.g., Lair-Del Rio v. Astrue*, 380 F. App'x 694, 695 (9th Cir. 2010) (unpublished), but medical opinions dated after the claimant's DLI are still relevant, *Lester*, 81 F.3d at 832.[3]

To be sure, the ALJ has the ability to determine whether the environmental restrictions required by Dr. Lababidi's assessment are supported by, or consistent with, the medical record. But merely characterizing them as "extreme" without addressing supportability and/or consistency, or addressing any other permissible consideration listed under 20 C.F.R. § 404.1520c(c) does not support the ALJ's rejection of Dr. Lababidi's opinion. The statement does underscore the impact of the extensive limitations on available jobs and Plaintiff's ability to work, but it does not indicate whether they are internally supported or consistent with the record. (AR. at 23.)  Under the prior regulations, the Ninth Circuit seemed to accept something like this reasoning but in doing so it also explicitly

_____

[3] Although *Lester* applied prior case law recognizing the hierarchy of medical opinions, 81 F.3d at 830-31, post-DLI opinion evidence that supports the existence of limitations during the relevant period is still relevant under 20 C.F.R. § 404.1520c.

noted what was not stated reasoning by the ALJ here—an absence from the claimant's medical record of support for the limitations listed. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (affirming the ALJ when the rejected doctor's opinion was extreme and implausible and when there was no record support from any doctor's treatment notes, no indication from the record what the limitations were based upon, and no testimony from the claimant stating she had difficulty with the activities in question). Here, given Plaintiff's long history of pulmonary and cardiac impairments, there is at least support for some limitation on exposure to certain environmental hazards, such as pulmonary irritants.[4] Several medical providers who were prompted to opine as to Plaintiff's environmental restrictions opined that he would have such restrictions to varying degrees. (AR. at 125, 144, 1242.) In *Rollins*, to the contrary, the limitations were wholly unjustifiable in the record, as "[t]here [was] no indication in the record what the basis for these restrictions might be . . . ." *Rollins*, 261 F.3d at 856.

The ALJ's failure to discuss the other specific limitations Dr. Lababidi assigned was also error in this case. While the ALJ rejected the environmental limitations Dr. Lababidi described, the ALJ did not account for other specific limitations, including Plaintiff's need to elevate his legs to chair level while seated. (AR. at 21.) Defendant counters, "Plaintiff has provided no supporting evidence from Dr. Lababidi's check-box form to support the opinion that he would be required to elevate his legs during a working day[,]" but Dr. Lababidi stated this accommodation would be necessary due to Plaintiff's lower extremity edema (AR. at 1242), which has at least some support in the record (AR. at 427, 436-37, 1117, 1120, 1218, 1220-21). Defendant further counters that the ALJ's five-minute sit-stand option every hour would be sufficient to accommodate Plaintiff's edema (Def. Br. at 13-14), but Dr. Lababidi concluded Plaintiff could sit for only "about 2 hours" of a day cumulatively (the ALJ concluded Plaintiff could sit for six hours), and that he would be

---

[4] Plaintiff testified he experiences shortness of breath and chest pains consisting of sharp and pressure-like pain. (AR. at 62, 67.) He received pulmonologist treatment during the relevant period for obstructive sleep apnea and anti-coagulant medication subsequent to a pulmonary embolism. (AR. at 395-420, 999-1008.)

unable to engage in prolonged sitting. (AR. at 1241-42.) Thus, the sit-stand option does not address the doctor's expressed concerns. Further, by singling out the "extreme" environmental limitations, the ALJ effectively ignored the many other specific limitations that have support in the record. "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

Finally, the ALJ concluded that "there is no explanation with evidence for many of the specific limitations [Dr. Lababidi] found," but this rationale is also not supported by substantial evidence. Dr. Lababidi completed a form that consists of check-marked limitations with some, but not extensive, narrative explanation. (AR. at 1240-43.) When prompted to identify "clinical findings, laboratory and test results that show [Plaintiff's] impairments[,]" for instance, Dr. Lababidi cited nuclear stress testing showing "a large, fixed inferior wall defect with mild-mod[erate] lateral ischemia." (AR. at 1240.) Dr. Lababidi described Plaintiff's symptoms as "chest pressure, substernal occurring with increased activity . . . ." (AR. at 1240.) He noted angina episodes occur "at least once daily if not more," and that Plaintiff typically would rest for "at least 2-3 hours" after each episode. (AR. at 1240.) Dr. Lababidi remarked that stress increases Plaintiff's shortness of breath, anxiety, and chest pain, and that his physical condition caused emotional difficulties such as depression and chronic anxiety which contributed to his symptoms and limitations. (AR. at 1241.) He indicated Plaintiff's chest pain and shortness of breath would necessitate unscheduled breaks causing him to need to lie down, and that he would need to elevate his legs to chair-level due to edema. (AR. at 1242.) He estimated Plaintiff would likely be absent from work more than four days per month due to daily chest pain and shortness of breath. (AR. at 1243.) When prompted to explain other limitations, Dr. Lababidi stated Plaintiff "has moderate [chest pain], [shortness of breath] upon activity or exertion, stress worsens his symptoms; [and] he should avoid confrontational situations." (AR. at 1243.)

The ALJ is correct that a number of the doctor's specific conclusions are not accompanied by any commentary. For instance, on the form, Dr. Lababidi was prompted

to explain how Plaintiff's physical symptoms and limitations would cause emotional difficulties, but he did not explain. (AR. at 1241.) Dr. Lababidi did not cite or explain the specific evidence underlying Plaintiff's sitting, standing, walking, lifting, postural, and environmental limitations (AR. at 1241-42), and he offered no explanation for his conclusion Plaintiff's symptoms would result in his being off-task 25% or more in a workday. (AR. at 1243.) Importantly, however, Dr. Lababidi was not prompted on the form to explain his answers to each question (AR. at 1241-43), and, as noted above, Dr. Lababidi already explained Plaintiff's diagnoses, symptoms, and the objective evidence supporting each. (AR. at 1240.)  Nevertheless, when Dr. Lababidi has offered reasons and the medical records support limitations which may be sufficient to render the Plaintiff disabled, the ALJ is not free to discount them solely because of the Doctor's failure to justify other limitations that he states are necessary.  *Id*. citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (superseded on other grounds), *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (under the specific-and-legitimate reasons standard, holding that although the doctor's opinion was in "check-box" form with "almost no detail or explanation," the ALJ erred by rejecting the doctor's opinion on the basis it was conclusory and poorly explained because the record, including that doctor's extensive treatment notes and the claimant's testimony, supported the doctor's conclusions); *Garrison v. Colvin*, 759 F.3d 995, 1014 n. 17 (9th Cir. 2014) (rejecting the check-box-form argument because the forms in question "did not stand alone: they reflected and were entirely consistent with the hundreds of pages of treatment notes created by [the doctors] in the course of their relationship with [the claimant].")

This analysis does not change despite the regulatory shift in the approach to medical opinions: while courts no longer afford deference to the opinions of treating or examining physicians, *Woods*, 32 F.4th at 787, the supportability of a physician's opinion necessarily still includes a review of that doctor's treatment notes, not just the narrative explanation on the form. *Compare* 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the *objective medical evidence* and supporting explanations presented by a medical source are to support his or

her medical opinion(s) . . . the more persuasive the medical opinions . . . will be.") (emphasis added) *with id.* § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from *other medical sources and nonmedical sources* in the claim, the more persuasive the medical opinion(s) . . . will be.") (emphasis added); *see also* 20 C.F.R. § 404.1502(f) ("Objective medical evidence means signs, laboratory findings, or both."); *Sollars v. Kijakazi*, No. CV-20-58-BU-BMM, 2021 WL 4963611, at *4-5 (D. Mont. Oct. 26, 2021) (holding the reasoning from *Burrell* still applies with respect to the supportability and consistency factors despite the regulatory change). As to whether an opinion is supported within the meaning of § 404.1520c(c)(1), the doctor's notes must be considered.

A proper analysis of this issue involves Dr. Lababidi's treatment notes, which span the relevant period. (AR. at 426-453, 720-25, 1209-1235.) These notes reveal that Dr. Lababidi, consistent with his assessment, routinely documented Plaintiff's reports of persistent chest pain and tightness, fatigue, shortness of breath, and edema. (AR. at 430, 434, 438, 722, 1220.) Dr. Lababidi's notes include objective testing, such as a treadmill test showing Plaintiff's poor functional capacity (AR. at 452) and echocardiogram results showing an estimated ejection fraction of 35%, among other findings. (AR. 446.) The Court is persuaded that Dr. Lababidi's documentation of Plaintiff's complaints, the objective testing, and Plaintiff's symptom testimony,[5] provide at least some support for the conclusions he reached. *Burrell*, 775 F.3d at 1140. Consequently, substantial evidence does not corroborate the ALJ's reasoning that Dr. Lababidi's opinion is unsupported.

Defendant argues the ALJ asserted generally that Dr. Lababidi's opinion is "not consistent with the evidence" the ALJ had summarized earlier in the decision. (Def. Br. at 12-13.) Reading the ALJ decision straightforwardly, however, it appears the ALJ cited three distinct reasons why Dr. Lababidi's opinion was "not supported by" and "not consistent with" the evidence: (1) that the doctor completed the form eight months after

---

[5] Plaintiff testified he can only walk 50 to 100 feet before needing rest, and that he reclines and elevates his legs "probably most of the day" on the advice of his treating providers. (AR. at 68, 70.) He testified he can only sit for 30 minutes before needing to change positions due to leg swelling. (AR. at 71.)

the date last insured and did not "relate" the limitations back to the relevant period before Plaintiff's DLI; (2) that the environmental limitations the doctor assigned are extreme; and (3) that he failed to explain some limitations he assigned. (AR. at 23.) Each of these reasons is insufficient for the reasons explained above, and this Court is "constrained to review the reasons the ALJ asserts." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations and quotations omitted).

While it may have been the ALJ's intent to refute Dr. Lababidi's report based on inconsistencies between it and the larger evidentiary record, the ALJ did not make this point clear or cite specific supportive evidence. (AR. at 23.) While the Ninth Circuit in *Woods* held that "an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence[,]" *Woods*, 32 F.4th at 787, the Court clarified—citing the new regulations—that "[t]he agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source, and *explain how it considered the supportability and consistency factors* in reaching these findings[,]" *id*. at 792 (cleaned up) (emphasis added). The bald assertion that an opinion is "not consistent with the evidence" does nothing to explain how or why, and while in many cases a reasonable inference can be made tying the ALJ's conclusion to the uncited evidence supporting that conclusion, here it is unclear what specific evidence the ALJ found belies Dr. Lababidi's opinions. *See Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) ("[T]he ALJ must provide sufficient reasoning that allows us to perform our own review, because the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (internal citations and quotation marks omitted); *see also Carrie D. v. Kijakazi*, No. 1:20-CV-03227-LRS, 2022 WL 2901010, at *6 (E.D. Wash. June 6, 2022) (holding the ALJ's general reference to normal clinical findings and the lack of support from the doctor's treatment notes is "an insufficient explanation under *Woods*" when the ALJ provided no citation to the record in support). For the reasons stated above, the Court finds the ALJ did not cite reasons supported by substantial evidence for rejecting Dr. Lababidi's opinion.

1    **2.    Plaintiff's treating family doctor, Dr. Bierman**

2            On June 18, 2020, Plaintiff's treating family doctor, Dr. Robert Bierman, completed

3    a "Physical Medical Source Statement" outlining Plaintiff's limitations resulting from

4    congestive heart failure and ischemic heart disease. (AR. at 1042.) Dr. Bierman noted

5    Plaintiff's symptoms of chronic dyspnea and fatigue, shortness of breath, chest pain at rest

6    or with exertion, dizziness, and depression. (AR. at 1042.) He indicated that "emotional

7    factors," including depression and anxiety, "contribute to the severity of [Plaintiff's]

8    symptoms and functional limitations[,]" and that these symptoms would frequently be

9    severe enough to interfere with Plaintiff's attention and concentration. (AR. at 1042-43.)

10   Dr. Bierman indicated Plaintiff could not perform "even low stress jobs[,]" that he could

11   walk less than one city block, sit for only one hour at a time and "about 2 hours" in an

12   eight-hour day, stand for only 15 minutes at one time and for less than two hours in a day,

13   and that he would need unscheduled breaks lasting 15 to 30 minutes. (AR. at 1043.) Dr.

14   Bierman initially indicated the earliest date those symptoms and limitations applied was

15   the date of the form, June 18, 2020 (AR. at 1045), but in a subsequent, amended version of

16   the same form, Dr. Bierman indicated the symptoms and limitations began in September

17   2015. (AR. at 1239.)

18           In the decision, the ALJ deemed this opinion unpersuasive, as it was "not supported

19   by and[ ]not consistent with the evidence." (AR. at 23.) The ALJ noted the opinion post-

20   dated Plaintiff's date last insured and "[did] not contain any explanation if [it] related back

21   to the period at issue." (AR. at 23.) The ALJ also noted "there is no explanation or citation

22   to evidence for the specific limitations, and there is no[] explanation for the hourly break

23   requirement." (AR. at 23.)

24           Again, as with Dr. Lababidi's opinion, the ALJ erred when he stated the assessments

25   "do not contain any explanation if they related back to the period at issue." (AR. at 23.) Dr.

26   Bierman clearly related those limitations back to the relevant period in the amended form.

27   (AR. at 1236.) Also, as with Dr. Lababidi's assessment, there is support both on the form

28   and in Dr. Bierman's treatment notes for the conclusions he reached. On the form, Dr.

Bierman noted that Plaintiff suffered from congestive heart failure and ischemic heart disease and that his prognosis was poor. (AR. at 1236.) He stated Plaintiff suffered from chronic fatigue and shortness of breath and chest pain at rest or exertion, and he cited objective testing such as an angiogram showing multi-vessel, severe coronary artery disease, and Plaintiff's past history of stent placements and diminished ejection fraction on echocardiogram. (AR. at 1236.) Dr. Bierman's treatment records document Plaintiff's chronic dyspnea on exertion (AR. at 1092, 1096, 1119) and leg swelling (AR. at 1093, 1097, 1117), and that he was "poorly active" due to symptoms (AR. at 1092, 1096). A few weeks before Plaintiff's amended onset date, Dr. Bierman remarked that Plaintiff suffered constant fatigue, among other symptoms, that he was "no longer able to work," and that he was "working on disability." (AR. at 1119.) Dr. Bierman's notes reflect he wrote and signed a note for Plaintiff's disability at that visit. (AR. at 1120.) The ALJ's reasoning as to the supportability of Dr. Bierman's report is also not corroborated by substantial evidence. 20 C.F.R. § 404.1520c(c)(1). Consequently, the ALJ also erred with respect to Dr. Bierman.

### 3.     The psychological consultative examiner, Dr. Farrah Hauke

On March 6, 2019, psychologist Farrah Hauke, Psy.D. conducted a records review, interview, and examination of Plaintiff on behalf of the state's Department of Economic Security. (AR. at 809-13.) Dr. Hauke observed Plaintiff presented with normal attention and concentration, a euthymic affect, and linear, logical, and goal-directed thinking. (AR. at 811.) Dr. Hauke noted Plaintiff presented with organized speech and a normal rate and tone, and that he "was not observed to be tearful, anxious, confused, irritable, or distressed." (AR. at 812.) She indicated Plaintiff presented as polite and cooperative, with normal insight and judgment, good comprehension, normal short-term memory, and fair long-term memory. (AR. at 812.) Plaintiff's mental status examination was "well within normal limits." (AR. at 812.) Dr. Hauke concluded that Plaintiff's symptoms met the criteria "for at least one psychological diagnosis but his current functioning does not appear to be impaired by psychological factors." (AR. at 812.) She opined Plaintiff's "primary

concerns, and reasons for not working, are his medical conditions. His psychiatric symptoms appear to be secondary." (AR. at 812.) In the accompanying medical source statement, Dr. Hauke concluded Plaintiff could understand, remember, and carry-out simple instructions, "but is not able to understand or remember detailed work-like procedures on a consistent basis." (AR. at 813.) She opined Plaintiff could sustain focus for 45-minute intervals and interact appropriately, "but would require coaching and support regarding neatness and attire before returning to the workplace environment." (AR. at 813.) She found he could be aware of normal hazards, respond appropriately to work setting changes, and take appropriate action. (AR. at 813.)

The ALJ found Dr. Hauke's opinion was "not supported by and is not consistent with the evidence." (AR. at 22.) The ALJ believed Dr. Hauke's "moderate finding" in the area of understanding and memory was "not consistent with the examination or the evidence." (AR. at 22.) In support, the ALJ cited Dr. Hauke's normal mental status findings, Plaintiff's generally normal mental findings elsewhere, his ability to drive himself to the examination, and his "high level of individual function." (AR. at 22.)

Substantial evidence supports the ALJ's conclusion that Dr. Hauke's opinion is inconsistent with the record and unsupported by her own examination. As noted earlier, the ALJ is correct that the results of Dr. Hauke's mental status examination of Plaintiff were "well within normal limits" (AR. at 812), and that Dr. Hauke's other observations were generally normal. She documented, for instance, Plaintiff's normal attention and concentration, his euthymic affect and "logical, goal-directed and linear" thinking, and his normal speech. (AR. at 811-12.) She stated Plaintiff "was not observed to be tearful, anxious, confused, irritable, or distressed[,]" and documented other normal findings, including Plaintiff's insight, judgment, comprehension, and short-term memory. (AR. at 811-12.) She observed Plaintiff to be "polite and cooperative." (AR. at 812.)

The ALJ is also correct Plaintiff had "many normal findings" upon mental status examination in the record generally, some of which the ALJ cited elsewhere in the decision, including an appropriate mood and affect (AR. at 18, citing 509, 753, 756, 837, 1100,

- 16 -

1163); normal or clear speech (AR. at 18, citing 753, 756, 759, 781); unremarkable or logical thought processes (AR. at 18, citing 753, 759, 781); good insight or judgment (AR. at 18, citing 756, 759, 781, 837, 1100, 1163); good memory (AR. at 18, citing 756, 759, 1100); and good concentration and attention span (AR. at 18, citing 756, 759). The ALJ's reasoning that Dr. Hauke's opinion was inconsistent with the larger evidentiary record and unsupported by her own examination is supported by substantial evidence. 20 C.F.R. § 404.1520c(c)(1)-(2). Consequently, any error with respect to the ALJ's other stated reasons would be harmless. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). The ALJ did not err with respect to Dr. Hauke.

**4.      Plaintiff's treating mental health nurse practitioner, Courtney Gaines**

On June 16, 2020, Plaintiff's treating mental health provider, nurse practitioner Courtney Gaines, completed a "Mental Medical Source Statement" assessing Plaintiff's mental health limitations. (AR. at 1036-41, 1200-05.) She noted Plaintiff "continues to have fluctuations in mood, anxiety, and sleep" despite medications, and that he experiences side effects including dizziness, insomnia, fatigue, and palpitations. (AR. at 1036.) She noted his prognosis was poor. (AR. at 1036.) She assigned to Plaintiff "marked" limitations in a host of mental health categories and extreme limitations in the areas of dealing with the stress of semi-skilled work, interacting appropriately with the general public, travelling to unfamiliar places, and using public transportation. (AR. at 1038-39.) She predicted Plaintiff would be absent more than four days per month, and opined these limitations existed as early as 2018. (AR. at 1040-41.)

The ALJ again deemed these opinions not persuasive on the basis they are "not supported by" and "not consistent with" the evidence. (AR. at 22.) The ALJ noted these opinions post-date Plaintiff's date last insured by six months and "do not contain any explanation if they related back to the period at issue." (AR. at 22.) The ALJ found "there is not [sic] explanation for such extreme findings," that Plaintiff had "generally had normal mental findings, he responded well to medication, and he had an overall high level of mental function." (AR. at 22.)

The ALJ's rationale regarding the supportability and consistency of NP Gaines' opinion is supported by substantial evidence.[6] NP Gaines assigned nearly uniform marked limitations across two-dozen areas of functioning without explanation for her conclusions. (AR. at 1038-39.) The ALJ again referred to Plaintiff's predominately normal mental status findings (which the ALJ cited earlier and can be found among NP Gaines' treatment notes) and reports of responding well to medication—assertions which are each supported by substantial evidence as described above. NP Gaines' notes contain scant support in the form of mental status findings considering the numerous marked and extreme limitations she assigned.[7] Consequently, the ALJ did not err by rejecting NP Gaines' opinion with the reasons stated.

## C.   Plaintiff's testimony

To properly evaluate a Plaintiff's symptom testimony, the ALJ must first "determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted). Once the ALJ establishes the claimant has met the first step, "and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal quotation marks and citation omitted). To that effect, "the ALJ may consider, among other factors, ordinary techniques of credibility evaluation, inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and the

---

[6] Again, the ALJ's belief the provider failed to relate the limitations back to the relevant period is incorrect. NP Gaines concluded Plaintiff had these limitations in 2018, well before his DLI. (AR. at 1041.) Considering that the ALJ provided other properly-supported reasons, however, this error is harmless. *Stout*, 454 F.3d at 1055.

[7] In October 2018 NP Gaines documented Plaintiff's depressed, anxious mood, but cooperative attitude, clear speech, logical thought process, normal cognition, and normal insight and judgment. (AR. at 802.) NP Gaines examined Plaintiff in January, March, May, June, September, and December 2019, and in March 2020. (AR. at 788-93, 1060-61, 1066, 1072-73, 1079-80, 1085-86.) She documented similar mental status findings throughout these exams, such as a depressed, anxious mood or attitude, but logical thought processes, and normal thought content, insight, and judgment. (AR. at 788-93, 1060-61, 1066, 1072-73, 1079-80, 1085-86.)

claimant's daily activities." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) (quotations and citations omitted). An ALJ may also consider the statements of physicians and other witnesses as to the claimant's symptoms, functional limitations, and daily activities. *Id.* (quotations and citations omitted).

Of particular importance here, while an ALJ may consider the claimant's reported activities, "[t]his line of reasoning clearly has its limits: The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citations omitted). But the ALJ may consider activities transferable to a work setting if the claimant is able to spend "a substantial part of his day" engaged in them. *Id.* "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1113. An ALJ may reject symptom testimony on the basis of activities that conflict with the claimant's statements about the severity of his symptoms. *Valentine*, 574 F.3d at 693. Importantly, however, the ALJ "may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quotations omitted).

In the decision, the ALJ concluded that while Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms . . . [his] statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR. at 20.) After summarizing the medical evidence, the ALJ cited evidence that "[Plaintiff's] allegations concerning the physical impairments are not consistent with the record[,]" such as evidence of normal gait, muscle strength, tone, and sensation. (AR. at 21.) The ALJ also cited evidence that his nitroglycerine medication and rest were sufficient to manage his chest pain and dyspnea symptoms, and that he had

generally "normal cardiovascular findings" upon examination. (AR. at 21.) The ALJ also noted Plaintiff had been recommended for increased physical activity and exercise, and that Plaintiff reported "doing more with regards to physical activity", such as assisting with his mother's care, and performing his own daily activities such as housework. (AR. at 21.) The ALJ also found that "some of [Plaintiff's] own statements strike against the allegations of physical disability[,]" such as his taking care of pets, going outside daily, and getting around by walking, driving, or riding in a car. (AR. at 21-22.) The ALJ noted Plaintiff reported shopping for food weekly "for about 2 to 3 hours at a time." (AR. at 22.)

The Court finds the ALJ cited clear, convincing reasons supported by substantial evidence for discrediting Plaintiff's symptom testimony. Plaintiff's activities, including the statement in his December 2018 report of daily functioning that he shops for groceries in stores "once a week for about 2-3 hours" belie his allegations of disabling physical impairments. *Molina*, 674 F.3d at 1113. Although Plaintiff offered conflicting testimony at the hearing in response to questioning about this statement (AR. at 74-75), "the ALJ 'is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Ford*, 950 F.3d at 1149 (9th Cir. 2020). The ALJ cited evidence Plaintiff was able to engage in "activities of daily living without limitations," "do some housework with limitations," and help care for his mother (AR. at 1211, 1217.) This is clear, convincing reasoning supported by substantial evidence. As the ALJ cited at least one clear, convincing reason for rejecting Plaintiff's symptom testimony, any error with respect to the other reasons the ALJ cited is harmless.

**D.    Remedy**

In cases of error, "[t]he decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Generally, the appropriate remedy is "remand to the agency for further proceedings before directing an award of benefits[,]" *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) *as amended* (January 25, 2018), but the Court may remand for the award of benefits if the following criteria are met: "(1) the record has been

fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand[,]" *Garrison*, 759 F.3d at 1020. Even if the credit-as-true elements are satisfied, the Court has "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021.

The Court will remand for additional proceedings, as it pertains to the question of disability. Plaintiff's reported ability to shop for groceries in stores for "about 2-3 hours" at a time without indicating a need for ambulatory assistance raises questions as to his functional capacity (AR. at 74-75, 274, 277), considering he testified to limited standing and walking ability (50-to-100 feet before needing rest).[8] (AR. at 68-70.) Plaintiff also gave testimony inconsistent with his reported lifting limitation of five pounds (AR. at 63), as he testified to lifting an object approximating 50 pounds on an earlier occasion. (AR. at 66.)

**IT IS THEREFORE ORDERED** reversing the September 28, 2020 decision of the Administrative Law Judge (*id.* at 13-29) and remanding for further proceedings consistent with this opinion.

**IT IS FURTHER ORDERED** directing the Clerk to enter final judgment consistent with this Order and to close this case.

Dated this 24th day of January, 2023.

G. Murray Snow
Chief United States District Judge

---

[8] The Court acknowledges Plaintiff provided testimony conflicting with this statement at the hearing (AR. at 74-75), but the ALJ resolved this inconsistency against Plaintiff (AR. at 18) (citing Plaintiff's ability to shop for two-to-three hours at one time), and a statement so dramatically at odds with the limitations Plaintiff testified to (AR. at 70) and that his physicians assigned (AR. at 1237-38, 1241), raises serious questions as to the length of time Plaintiff can stand and walk.